## FIDELITY & CASUALTY CO. OF NEW YORK v. PHELPS et ux.

No. 746.

District Court, S. D. West Virginia, Bluefield Division.

Sept. 12, 1932.

French, Easley, Easley & French, of Bluefield, W. Va., for plaintiff.

Richardson & Kemper, of Bluefield, W. Va., for defendants.

McCLINTIC, District Judge.

The plaintiff, a corporation of the state of New York, on the 3d day of December, 1923, issued to the defendant J. F. Phelps a policy of insurance, in which the defendant Hettie G. Phelps, wife of defendant J. F. Phelps, was named as beneficiary.

This policy insured the defendant J. F. Phelps against bodily injury sustained through accidental means, and resulting directly, independently, and exclusively of all other causes in total disability that immediately and continuously prevented the assured from performing such and every duty pertaining to his occupation, and certain partial disabilities, and also against death, and provided that, if the bodily injury was sustained by the assured while in a private conveyance, the indemnity was to be doubled.

On the 28th day of June, 1929, J. F. Phelps, defendant, was injured in an accident, and the plaintiff, upon the claim filed by Phelps for double indemnity under that policy, paid to the injured party the sum of $10,871.20, which paid his claims up to the 1st day of August, 1931. On the 26th day of October, 1931, this suit was filed, praying that the policy should be delivered up by J. F. Phelps, and canceled and held for naught, and that the plaintiff have decree against Phelps for the full amount paid him under the said policy, after deducting the premiums paid on the said policy, and that Phelps be enjoined and restrained from bringing or

prosecuting any action or suit to collect any benefits of the policy pending the termination of this suit.

The defendants filed a motion to dismiss the bill on the ground that there was no jurisdiction in equity, and plain, adequate, and complete remedy at law. This motion was argued and overruled. The defendants then filed an answer, denying the important allegations of the bill.

The bill alleges that in the policy there was a schedule of warranties, and warranty Q thereof is as follows: "I am in sound condition mentally and physically, except as follows: No exceptions."

Each year, upon the payment of the continuing premium, a certificate continuing the policy in force was given to the defendant Phelps, and that certificate did continue the policy and contained this provision: "Provided that the assured, upon the date first mentioned above, is in sound condition mentally and physically, except as stated in the policy."

The date "first mentioned above" was the date of the issuance of the policy, to wit, the 3d day of December, 1922.

The bill charged that the warranty Q was untrue, and that J. F. Phelps was, at the time of the issuance of the policy, and had been, blind, or practically blind, in his left eye since his youth, and that he well knew such alleged fact at the time of making his application for the policy, and at the time he received the policy, and that the representation so made in warranty Q materially affected the risk of the insurance, and that, had the representation correctly stated the truth, as claimed by the plaintiff, as to the condition of Phelps' eye, the policy would not have been issued.

The bill further alleged that, when Phelps made application for indemnities under the policy, and when the same were paid by the plaintiff, it had no knowledge or information that the statement made by Phelps was not true, and that during all of said time Phelps had concealed from the plaintiff the fact that at the time he made the application for the policy, and at the time the policy was issued to him, he was not in sound condition mentally and physically, as he stated he was in the warranty contained in the policy.

The bill further alleged that Phelps would bring a multiplicity of suits upon the policy, and had brought one suit when the bill was filed, and, as the installments under the policy were payable every sixty days, he would continue to sue for each installment thereafter claimed by him.

Phelps, in his answer, denied that section Q of the schedule was untrue, and denied that he had concealed any fact from the plaintiff touching upon the soundness of his condition, mentally or physically, within the meaning of the policy of insurance.

Evidence was taken upon the issue thus made. It appeared that the plaintiff, under the right reserved to it in the policy, had many examinations made of the assured to determine whether or no he was entitled to the payment of the claims by him thereunder. It further appeared that a suit was instituted by the plaintiff against the defendant some time prior to the institution of this suit for the purpose of having it adjudicated that the assured had fully recovered from his injuries and was not entitled to any further benefits thereunder at that time.

While that suit was pending, the plaintiff had the assured examined by a specialist in nervous and mental diseases on July 8, 1931. A report was made by this specialist to the plaintiff and to the defendant, and under this report the plaintiff dismissed the suit then pending, and paid up the amount claimed by the assured to the 1st day of August, 1931.

However, the specialist made a subsequent report to the plaintiff, in which he stated the assured had told the specialist, in substance, that he had been blind, or almost blind, in his left eye from his early youth. Upon this alleged statement, the plaintiff, exercising its right, under the policy, requested the assured to go to the city of Richmond, in the state of Virginia, and there the specialist in nervous diseases sent the assured to two eye specialists to be examined. The eye specialists likewise testified that the assured told each of them, or both together, that he had had a "rising" in his ear in his extreme youth, and that his left eye had not had full sight since he was a child, and also that it had been crossed in childhood. The eye specialists also each testified that the vision of the right eye was a little impaired, and the vision of the left eye was very much impaired. In technical language, it was testified that normal vision was twenty-twenty (20/20); that the vision of the right eye of the assured was twenty-thirty (20/30), and the vision of the left eye was twenty-two hundred (20/200). These examinations, and the reports made by the specialists, formed the basis for the institution of this suit.

The assured and the defendant Hettie G. Phelps each specifically denied that any such

statement, as claimed by the first specialist, was made to him, and alleged that they were both present during the whole examination and conversation in July, 1931. The assured specifically denied that he had made such statements to the eye specialists in October, 1931, when he alone was present with them. The evidence in the case by the nerve specialist and one of the eye-specialists was made by deposition. The evidence of the other eye specialist and the defendants was given in open court.

Taking into consideration the many examinations made of the assured, and his apparent feeling that the plaintiff was trying to catch him in something so as to keep from paying the indemnities under the policy, and his apparent ability, as shown by his testimony and his manner, and his flat denial of making the statements as claimed by the specialists, and the denial of Hettie G. Phelps as to the statements made to the nerve specialist, I would be of opinion, if it were necessary to decide it, that the assured's statements did not go as far as the specialists claimed.

However, it seems certain, from the evidence of the eye specialists, that in October, 1931, the vision of the left eye of the assured was very much impaired. There was evidence of the assured and his wife that after the accident in June, 1929, the assured was not able to see as well as before that time. The assured, by his own evidence, and by that of a large number of witnesses, conclusively proved that he had performed all sorts of duties in several occupations that showed that he had excellent eye sight and had used his eyes for many purposes, which purposes required rather unusual vision, and that he had done this for at least thirty years, or more, before this policy was issued. The assured testified that he had worn glasses since 1893, that his first glasses were fitted by an eye specialist, and that his last glasses, which he was then wearing at the time of the trial of the suit, were fitted by an optometrist in Bluefield. This gentleman was a witness in the case, and testified that about 1920 he had found no trouble as the specialists found in October, 1931. The evidence further seems conclusive that the assured had had no accident by which the sight of his left eye had been impaired, unless it might have been done by the accident of June 28, 1929.

I have reached the conclusion that the plaintiff has failed to prove, by a preponderance of the evidence, its allegation that on the 3d day of December, 1922, the assured made a false statement in the warranty in issue in this case. I am further of the opinion that the assured, in perfect good faith, made the warranty, believing, and there is strong evidence to prove, that the vision of his eye was good.

It is unnecessary to quote a great many of the decisions which the reports carry to the effect that good faith was all that could be required of the assured, and that no forfeiture could be had except upon a showing of fraud. It seems to me to be very plain that the whole life of the assured, and all the acts and works and labor done by him, are very convincing that he, in perfect good faith, believed that he was mentally and physically sound at the time of the issuance of the policy.

I appreciate the fact that in another case lately before me, where the assured had failed to state a proven fact, to wit, that he had had a physician's prescription within the time specified, such failure on the part of the assured did void the policy. However, a statement by any of us about ourselves and our state of health, and our mental and physical condition, must always be relative to what we know of ourselves, and, unless something apparent occurs within a relatively recent time to call a certain condition to our attention, such a general statement can only be a representation. A condition, even if true, which had occurred nearly fifty years before the time of the issuance of the policy, and which had never become acute or had never caused any difficulty of vision under the most trying use of the eyes for from thirty to forty years, would not occur to the ordinary person, nor indeed, would it occur to any person under the same circumstances under which this policy was issued.

I am of opinion, therefore, that a decree should be entered dismissing the bill.